We'll hear argument next today in Case 11-713, Perry v. Perez and the Consolidated Cases. Mr. Clement. Mr. Chief Justice, and may it please the Court, the judicial maps drawn here are truly remarkable. They reflect the reality that the district court below lost sight of first principles. The Court repeatedly invoked the principle that these were only interim maps and not remedial maps. But that obscures the reality that a court has the authority to draw an election map, surely one of the most powerful tools in the judicial arsenal, only if it is identifying specific statutory or constitutional violations or a substantial likelihood thereof. Mr. Clement, Section 5 says you can't draw new maps unless they've been preclear. You can't put them into effect. So the only thing that exists is old maps until you get the preclearance. I don't see how we can give deference to an enacted new map if Section 5 says don't give it effect until it's been precleared. Well, Justice Sotomayor, obviously Section 5 is clear that the new map drawn by the Texas legislature cannot take effect of their own force. But that doesn't answer the question of whether a judge, when having to impose a remedial map to address what all concede is a one-person, one-vote problem with the benchmark maps, can look to the new maps, which also remedy that same one-person, one-vote problem, for guidance. And this Court in its reappearance — But you're asking for more than for guidance. You're asking for deference. You're saying they have to start with the new map even though that map hasn't been approved. That's right, Your Honor. Instead of starting, as the Court below did, with the old map, which had been approved. Right. We are, in fairness, we're asking for it to be used as the starting point for drawing the new map. But that's because — Doesn't that turn Section 5 on its head? No, I don't think so, Your Honor, for a number of reasons. One is that the obligation to go to the preclearance court or to go to the Attorney General remains fully in place. So the only question is, what is going to inform the district court in Texas's exercise of remedial authority to remedy the one-person, one-vote problem with the remedial plan — with the benchmark plans, rather? Now, this Court, from the very beginning of its reapportionment cases, has emphasized the need to look for legislative guidance in order to inform the judicial exercise of solving that reapportionment problem. And the need to look to the new maps, I think, is most acute, of course, with the congressional maps. Because the benchmark is a fine map, but it's a map for 32 seats. And Congress here, the legislature of Texas, has spoken as to how it would like to divide the new 36-seat allocation up. And it seems to be quite odd that the Court would simply ignore that judgment when it could look to that as the starting point. Ginsburg. It didn't ignore it. It took it into account along with other plans. My — Mr. Clement, suppose the D.C. court that has exclusive authority over preclearance in mid-February denies preclearance. And suppose we accept your position. You prevail in this proceeding. And then the three-judge district court says, this plan — these plans do not meet the Section 5 requirement, we deny preclearance. What happens if we use the Texas plan that has not been precleared as the interim plan? Well, Justice Ginsburg, as a practical matter, I suppose at that point, appellees would go to the Court in Texas and say, you need to revise your interim maps once again. Now, I think since the premise for the Court drawing its interim maps is that time is of the essence, it can't wait any longer, the Texas court may deny that motion or it may grant that motion. I mean, I don't — I don't really have a crystal ball to take that into account. But what I do think is particularly anomalous is let's suppose that the D.C. court does deny preclearance. At that point, it's common ground that the plan, the legislatively enacted plan, even though it's denied preclearance, would be something that the Texas court would have to defer to. That's basically Upham. So it's the oddity of the other side's position. Ginsburg, I don't see how it's basically Upham. That was a plan. There were two contiguous districts. There was a problem with them. The Attorney General said the rest of it was okay. Here, the entire plan, the plans are opposed. Well, Justice Ginsburg, I mean, it's true that the Justice Department does raise a purpose objection to the plans as a whole. But, of course, even that takes its force from the way particular districts are being drawn. It seems to me quite likely that, you know, obviously our position is that the D.C. court is most likely to grant preclearance. But if they were to deny it, it seems quite likely that they would deny it as to particular districts. And then Upham would make clear that you would give — that the Texas court would give deference to the legislative plan. And the anomaly of the other side's position is you give less deference to a plan when preclearance is denied. Can I ask you a question about timing? Let's suppose that the district court in Washington moves expeditiously and issues a decision in mid-February. Are there insuperable problems with postponing the Texas primary so that the plan that is to be used can — doesn't have to be formulated until after the district court in Washington has ruled? Texas has a very early primary. Some States have them for congressional races in the fall. And the latest presidential primary, I think, is at the end of June. So why can't this all be pushed back? And wouldn't that eliminate a lot of the problems that we are grappling with in this case? Well, Justice Alito, two answers. One is, as a practical matter, all of the affected, you know, entities in Texas have gotten together and they've agreed on the ability to move the primary back to April given — on the assumption that a map could be in place by February 1st. Now, you know, the primary has been moved from March to April already. So I can't tell you that it's impossible to move it again. But it's also quite, you know, in a sense, I mean, the question becomes — I mean, Texas has made its own determination that it wants to have a relatively early primary. That's not something it cocked up for this set of elections. It's had that in place since at least 1988. And so the question is, how much do you want to interfere with that judgment? Alito, if we have a binary choice, if it's either the plan enacted by the Texas legislature or the plan that's already been drawn up by the Court, yes, that could be presumably resolved rather quickly. But what if neither of those is fully acceptable? Then is it practicable to have the primary on the date that's been agreed on? And if not, then wouldn't — would you just prefer to limit us to those two possibilities or would Texas entertain the possibility of moving the primary back? Well, look, Texas wants the Court to have the opportunity to get this right. We think the decision below is profoundly wrong. We think it's important for this Court to send a clear signal to the courts that would provide relief not just in this case, but to future situations where this arose. Just one more question, background question about preclearance. Assume that the Court of Appeal — that the three-judge district court in Columbia in the preclearance proceeding finds some problems with two or three of the districts, say, in the congressional plan. Does it just say there are problems with these districts, we therefore deny preclearance, or does it then give guidance and say, we would give preclearance if you made the following changes? Does it — in other words, does it give you a road map? How do these decisions work? That's what I'm asking. Well, I don't think there's a road map for the extent to which they give a road map. I think there are two things that are crystal clear. One is that when the D.C. authority, be it the Attorney General or the Court, denies preclearance, it denies preclearance. The plan is not preclear. There's no such thing as preclearance in part or partial preclearance. As the Justice Department puts it, it doesn't work like a line-item veto. Now, that's not to say — and here's the second point — that's not to say that the Court doesn't provide reasoning for its decision or the Attorney General. And that's why in Upham, for example, that the court — this court knew that the objections were to two particular districts, even though the effect in Upham was to not preclear the whole plan. And it seems to me the mistake of the district court is it effectively treats the unprecleared plan as a nullity. And that's the exact word that Judge Johnson used in the lower court opinion in Upham. And this Court reversed, because it said, no, you don't ignore that. But on the other hand, what you do is you take into account the judgment of the D.C. — the Attorney General in that case. But other than that, you take the plan into account, notwithstanding the fact that it hasn't been precleared. Kagan. But we've said over and over, Mr. Clement, that it's the Attorney General and the district court in D.C. that have exclusive jurisdiction over this set of questions, and that we don't want courts in other part of the country to try to mimic what those — what that court and the Attorney General are supposed to do. And you are essentially asking for the district court in the State of Texas to try to predict what they're going to do and to mimic what they're going to do. And that's why Justice Alito suggests, well, look, if we've said that only the district court in D.C. and the Attorney General should do this, let's wait until they do it and go from there. Well, Justice Kagan, here's why — we're not — we're not asking the regional court to mimic the D.C. court's function. We're asking it to perform correctly the one — one of the roles that this court has always made clear the regional court retains, and that's to provide temporary relief. If you look at this Court's decisions that essentially worn off a regional course from irrigating to itself, the final preclearance decision — I'm thinking, for example, of Conner v. Waller — those same decisions say, but this is not with prejudice to your ability to provide temporary relief. Now, our position is quite simple. If we're in a situation where the regional court has to provide temporary relief, then it should apply the same standards that ours apply everywhere to courts issuing temporary relief. But you're not taking into account the fact that, as Justice Sotomayor said, Section 5 itself operates as an injunction, and it's an injunction against the use of an unprecleared plan. Justice Kagan, I think we are taking that into account. I mean, and I think that's at the heart of what's going on here. You have to ask yourself the question, what is the remedy that the Texas court in this case was trying — what is the violation, rather, that the Texas court was trying to remedy? The appellees proceed, and I think your question proceeds on the assumption, as if the violation is a Section 5 violation. But that's not what motivated the Court's opinion. And you can — I mean, look at page 96 of the Joint Appendix, where the Court specifically says, look, Texas has always been clear. They need to get preclearance. So this is not about enjoining them from implementing the plan. The constitutional violation that's being remedied here, and the only thing that gave the Texas court any authority, is the one-person, one-vote violation with the old plans. And so the question— Breyer. Breyer. And I think it's fairly clear in the U.S. House plan, they say things like, the Court began by considering the uncontested districts from the enacted plan that embraced neutral districting principles, although it wasn't required to give any deference. And you say they're wrong about that. The Court attempted to embrace as many of the uncontested districts as possible.  And when I finished reading their opinions, I thought, well, there may be a difference between what you say and they say, but I'm not sure that there is a difference that's reflected in the maps. And so it's now January 9th. We have to have something in effect by February 1st. They said that they're paying attention to what the legislature did. And when I look at the maps, as far as I can tell, they include some more, some less, most in the State Senate, but they include a lot of the State's changes. So what am I supposed to do? I mean, I can't tell whether you're right or wrong without looking district by district by district by district. What am I supposed to do on January 9th? Well, I think on January 9th, Justice Breyer, you should take another look at El Paso County. Because I think if you look at El Paso County— In which — in which? In either the congressional map or the House map. I think if you look at El Paso County, what you cannot conclude is that all— What district is that? What's that? What district is that? Well, it depends. If we're looking at the congressional map, I believe it's district 16 or 17. And that's — those maps start on page— Okay. El Paso County in the original plan, I guess, was all like number 16. I've got it in front of me and they split it. And it was split somewhat differently or not. Okay. Well, I mean, I think you're understating it. I mean, on the benchmark plan— No, no, no. I'm right. That was a straight line. Yeah. On the enacted plan, it was a different straight line. Correct. And in— So, so. All right. All right. Now, why was that wrong? But my point— Why is that wrong? Tell me why it's wrong for them to do that. I want to — I want to say two reasons why it's wrong. But first, I think that really does answer your premise, which is that all the Court was doing was remedying one person— No, I didn't say that. I said, in their way of thinking, they are taking the map into account. Now, the enacted one, if I disagree with that, I can't disagree at the level of principle. I have to disagree at the level of particular district. So that's why I asked you the question. So you point to District 16 and I say, very well, tell me what they did wrong and why. Because, remember, they are facing a challenge that's based on Section 5, part purpose. And the district court there said in the D.C., you don't survive — I can't give you summary judgment on that. Purpose here may have been violated. All right? Now, you tell me what's wrong with District 16, which I guess is your strongest case. That would be helpful. No, I'm not saying it's my strongest case. I'm saying it's illustrative of the problem. Another thing that's illustrative of the problem is that the court lost sight of what it was supposed to be doing. It was supposed to be doing what it was supposed to be doing. Breyer. They couldn't have lost sight at the level of generality, because at the level of generality, they said we're trying to take into account the map. I'm just repeating myself. I want to know what is wrong with the drawing of District 16, what they did, given that there's a Section 5 challenge based on purpose. And what's wrong with it is because they neither started with the old benchmark plan and said we're going to solve a one-person, one-vote problem, nor did they start with the new legislative plan and say is there some violation that allows us to change that plan. They instead, as they told you, said that they were on their own drawing an independent map. I'm sorry. That's even more. Maybe you can finish your answer, please. What I was hoping to say is that they told you they were drawing an independent map. And what they told you is that they thought that they were under an affirmative obligation not to defer to the legislative enactment because it hadn't been precleared. And the oddity of this, I mean, you know, look, you're right. In certain places, they then turn around and say, but we deferred where we could. But the oddity of their position is their first premise, which is the one thing we can't do in drawing these maps, is look at that unprecleared map. There's no explanation for why, if that premise was right, why would be even a good thing if they were pointing to the other map? Counsel, I'm not sure how I understand that, okay? As I looked at one of the El Paso maps, the enacted map created an antler-type district, a head and two unconnected antlers on top, nothing tying them together. The district court went back to the benchmark and said, this is the benchmark district, now I'm going to draw the districts around it that fall naturally, trying to stay within neutral principles of not dividing up the city more than I have to, and it came out with another district. I don't understand what principle, what legal principle the district court was violating that makes what it did with that particular county wrong. You're saying they should have given deference to an oddly shaped district that changed a prior benchmark that's been challenged as having been created specifically to minimize the Latino vote. All of the challenges that relate to El Paso are very significant. The district court has already denied summary judgment on that. Tell me what legal principle they violated, other than the deference principle that you're relying upon. The basic principle they violated is they drew an interim order that they thought wasn't a remedial order without it being based on any finding of substantial likelihood of a violation. If you may be right, you may be right. There may be a problem with those maps in El Paso. I don't think so, and I'd like to talk about that. But if the district court had said, you know, there's a problem with this because the two, the deer with two antlers, that violates, that's a substantial likelihood of violating the Constitution. We're going to remedy that. If that's what they did, this would be a very different case. Now, I do want to talk about the deer with two antlers, because what that ignores is that in the benchmark plan, the deer had one antler and an antenna. And so the district court, the map the district court drew doesn't look anything like the benchmark.  And so I think that just shows that what was going on here by the district court was something very different from either remedying a one-person, one-vote problem with the benchmark or from correcting specific identified problems with the legislature. Scalia. I had thought, Mr. Clement, that one of your objections was that in deciding whether they're using the benchmark or the legislature's proposed benchmark or the legislature's proposed new plan, whichever one they're using, in drawing up their own plan, they assumed the validity of all of the challenges. Is that not the case? Well, that is the case, Your Honor, and that is one of the many problems with the way that the Court proceeded here. Because once you lose sight of the fact that, look, we only have remedial authority if we're remedying substantial likelihood of violations that are identifiable in particular, well, then what are you going to do? So what this district court did after he started where Justice Breyer suggested is that the district court judges then said, look, we want to avoid the challenges that are brought by the plaintiffs. And what they mean by avoid is they basically take all the allegations at face value and then redraw the district court's plan. But you don't have any problem, if I'm a district judge and I think there is a substantial likelihood that a particular challenge will succeed, you don't have any problem with my drawing an interim plan to avoid that likelihood. Absolutely no problem at all, Justice Kennedy. And the great thing about that is that gives the district court a familiar role to play, applying familiar standards, and it gives this Court something to review. But the district court in that scenario is projecting what the D.C. court that has exclusive authority is going to do. And that's why I find your position troublesome. You are asking one court to make its best guess at what another court is likely to do, and that other court has exclusive jurisdiction. Can I respond to that, Justice Ginsburg, as follows, which is I had assumed that Justice Kennedy's question was not specific to Section 5 and could just as well be a Section 2 problem or an equal protection under the Constitution problem. And in that case, there is no problem. All the Court is doing is making a substantial likelihood determination of an issue that it's ultimately going to confront. But haven't we also said that with respect to Section 2 and constitutional violations that those allegations would be unripe in the prior to the district court or the Attorney General clearing a plan? Absolutely, Justice Kagan, but I think it's important to understand that to the extent that the district court in this remedial phase should take Section 5 into account, it's just in considering whether or not the remedial plan is consistent with Section 5 principles. And that's what the judges did in this case with respect to their own plan. So we are not asking them to do something with Section 5 that they otherwise wouldn't do. And again, I think if you come back to the particular question of what are they trying to remedy, I mean, they are trying to remedy the one-person, one-vote problem. So if that's what they are trying to remedy, why wouldn't they take into account the legislative policy judgments reflected in the unprecleared plan if that's the State we are in, if that's the snapshot we are in? I mean, keep in mind, this Court has throughout its work. Well, just because Section 5 says that there is no presumption of regularity attached to that plan, and indeed that it's unlawful to put that plan into effect without the proper approvals. Well, two things, Justice Kagan. One, I would beg to differ that what Section 5 says is that there is no presumption of regularity. And I think that's an — it's not just a quibble. Because I think if what Section 5 says is that there is no presumption of regularity or no presumption of good faith, then Section 5 I think is closer to the constitutional edge than this Court said in Northwest Austin. I think all it says — Kagan. Section 5 says somebody has to clear it before it can go into effect. Absolutely. But I don't think that means that the assumption is that the legislature didn't act in good faith in enacting the provision. And that brings me to my second point. Nobody said the opposite. The question just is, does somebody have to clear it? Here it wasn't cleared. Okay. I agree. But then the question is, if there's not a presumption of bad faith, then why wouldn't the Court take that legislative judgment into account in drawing its remedy for the one-person, one-vote violation in the remedial district? If I could add my second point, which is the other thing to keep in mind is the preclearance obligation is not driven by a congressional judgment that these covered jurisdictions are particularly bad at remedying one-person, one-vote problems. Obviously, Section 5 is driven by concerns about racial discrimination. So in that sense, it's particularly odd, given that what's at issue here is a remedy for a one-person, one-vote problem, that you would assume that you're not going to take into account the legislature's judgment as reflected in an unprecleared provision. No, I don't think that that's — Counsel, I think there are, I'd say, two different problems that I'm not quite sure how to come out. One, you cannot assume that the legislature's plan should be treated as if it were precleared. The district court in Texas cannot assume or presume what the district court here in D.C. is going to do. But on the other hand, it can't presume it the other way. In other words, it can't draw its interim plan assuming that there are going to be these Section 5 violations, because that's presuming what the court is going to do the other way. So how do we decide between those two? You have two wrong choices. How do we end up? Well, I think you try to split the difference by trying to apply the preliminary injunction standards. And I think if you do that, then what you're going to do is that you're going to ensure that the remedy that the district court draws for, as an interim matter for the one-person, one-vote problem, which is not the same thing as preclearance, that remedy is both consistent with the legislative policy judgments, but also with Section 2, with the Equal Protection Clause. And I suppose if this Court wants to, it can say that for purposes of interim temporary relief, the Court can look at Section 5 directly. I would think the better answer is, no, you just focus it on Section 2, the Equal Protection Clause, and then you ensure that the judicial plan is consistent with Section 5 principles, because that's the test that the Court's going to apply in any of these cases. Kennedy. Can you tell me, with reference to the two districts other than the Senate district, the congressional and Statehouse districts, did Judge Smith defer or use the Texas legislature's 2011 plan as a benchmark to some extent? I don't think Judge Smith, if I can answer your question, I think this does. I don't think Judge Smith did this the way that we think he should or focused on the benchmark. If you look at the congressional plan, what he did is he just basically picked one of the proposals that was a bipartisan proposal, so-called C-216. With respect to the House plan, I think he got it — the Texas House plan, I think he got it closer to right, but I don't think he applied the right standard. And I would ask you to look at Joint Appendix 193 and particularly his consideration of House District 33, because there what Judge Smith did is said, well, you know, there's these allegations and I find the — he said the State has persuasive responses, but out of an abundance of caution, I'm going to redraw the district. That doesn't seem quite right. I mean, if the State really does have persuasive responses, that ought to be enough to not redraw the district. Kennedy. So you would fault his solution for giving insufficient deference to the State of Texas 2011 plan? That's right. But it's certainly a fair improvement over what the district court majority did. If I could reserve the balance of my time. Thank you, Mr. Clement. Mr. Srinivasan. Thank you, Mr. Chief Justice, and may it please the Court. The fundamental flaw with Texas's approach is that it directly inverts the burden established by Section 5 of the Voting Rights Act. Section 5 places the burden on a covered jurisdiction to show that a proposed voting change is nondiscriminatory in purpose and effect, and the change can't go into effect unless and until the State carries it. Let me ask you this. Suppose that this — all the facts are the same except that this is in a State that is not subject to Section 5. Would there be a problem, in your view, with what the district — with what the district court did? With Judge Smith — with what Judge Smith did? Well, with Judge — with what Judge Smith did, I guess in that context, Justice Kennedy, there wouldn't be a Section 5 issue at all. Right. And all you'd be dealing with is Section 2 or the equal — And then we could use — then there would be no problem with using Texas as a benchmark, the Texas 2011 as a benchmark, as a starting point. Well, I — As a starting point. Well, I guess what I would say is this, that in the malapportionment context, what this Court typically has said the district court should do is to start with a plan that's already in effect and then modify it according to neutral districting principles to remove the malapportionment issue. What are neutral districting principles? Anybody who draws a map faces at the outset certain legal constraints, constitutional constraints, restrictions that are imposed by the Voting Rights Act, maybe some State law restrictions to the extent they're not inconsistent with Federal law. Once you've gotten beyond that point, all you have left is districting policy. There are policy choices, and there are many factors that can be taken into account in drawing a map. How compact do you want the districts to be? To what extent are you going to respect zones of common economic interest? To what extent are you going to try to preserve old districts? What about incumbents? What about party registration? Are you going to try to have balance? Are you going to try to favor one party or the other? That's all — those are all questions of policy. And the question is, who makes those policy decisions? Are they going to be the policy decisions that were made by the legislature, or are they going to be the policy decisions made by the district court? And to say they're going to apply neutral districting principles is a subterfuge. There is no such thing. Well, I guess I would disagree with you, Justice Alito, to make two preliminary observations on what a district court is supposed to do in this regard, and then I'll try to walk through the principles that should guide its inquiry. The first preliminary observation is what a district court is not supposed to do. And what a district court is not supposed to do is to take the unprecleared plan as a given because Section 5-4 closes it. Now, what's a district court supposed to do? It's not at sea, contrary to the underpinning of some of the arguments made today, because the district court starts with the last legally enforceable plan, which after all is the last manifestation of State policies and priorities. So you have that as a starting point. And then it has to modify that plan, of course, to deal with malapportionment issues and to comply with Section 2 and Section 5. Well, I don't want to interrupt you too much, but even if you do that, even if you start with the old plan and then you modify it to the extent necessary to comply with the Constitution and statutes, there are still, I'm sure a computer could shoot out dozens and dozens of possible maps, and somebody has to choose among them. Now, what criteria does a district judge, does a district court use in making that choice? There is discretion in the inquiry, Justice Alito. I'm not going to disagree with that. What it looks to is the districting criteria that have been applied by this jurisdiction in the past. And for example, in this case. It's not just discretion. It's political discretion. That's what's troublesome about it. And you — it seems to me the government makes — takes an absolutist approach to the proposition that you cannot use an unprecleared plan for any purpose. All the law says is that you cannot apply a precleared plan. The plan being applied here is not the Texas legislature's plan. It's the plan, a remedial plan, adopted by Federal judges. And to say that they cannot use in drawing up that plan the legislature's last political decisions seems to me not required by the mere prohibition against implementing that plan as the plan of the legislature. What would you do if the district court in Washington and the district court in Texas, neither one of them acts in time and it's too late? It's too late to have any primaries anymore. What would happen? What would happen? You can't use the old plan. You have this absolute rule against using the new plan. What happens? You disenfranchise every voter in Texas? No, I don't think you can do that. Because there may be some voters in Texas who — maybe some who will be prejudiced by using the current plan. I suggest in that situation there's nothing to do but use the Texas plan. Well, I don't — not in the context of Section 5, Your Honor. It's — that's one option. But the other option would be to use a malapportioned plan, which this Court has suggested would be something the courts could do. Now, that's not a preferred option, to be sure. But we're not in that situation here, because what you have is interim maps that have been developed. We're not in the kind of emergency situation that Your Honor wants. You have to acknowledge that there are some situations in which you can use the very plan that the Texas legislature adopted, even though it's not been precleared. Only if there's no time for a district court to adopt a different plan. So it's no longer an absolute rule. So the question is whether this — this is another reasonable exception to a non-absolute rule. There is an emergency exception, as there is with all sorts of legal rules, but that's so far as we would go. Now, I would like to address the proposition that what the Court would be doing here under Texas' view is just a standard application of substantial likelihood of success principles, because it's not. It's decidedly different from standard operation of substantial likelihood of success principles in three fundamental respects. The first goes to the burden, Justice Kennedy, and I think you alluded to this in your question. The burden in a preliminary injunction context stays with the same party at the preliminary injunction stage as at the merit stage. And so when in a preliminary injunction context, the Court is asking has there been a substantial likelihood of success on the merits, the same party has to make that showing as has to make that showing at the merit stage. Here, Texas would turn that upside down, because at the merit stage, which is the preclearance proceeding. Kagan. But you just said, well, Texas has to make the showing? That would certainly be better. I think that would improve things quite a bit. But that's not what Texas, the approach that Texas proposes today. But it's different in two other respects from a standard preliminary injunction context as well. And one is what Justice Ginsburg alluded to, which is here, you don't have a situation in which the same court that's going to forecast its ultimate adjudication of the merits is also deciding what it's going to do at the preliminary injunction stage. But that's exactly right. But you see it only on one side of the problem. You say, well, you can't treat it as if it's been precleared, because that would be prejudging what the court in D.C. is going to do. But you have no trouble with them saying, assuming that there are going to be these section 5 violations, and drawing additional majority-minority districts, which is just assuming on the other way what the court here in D.C. is going to do. I don't know how you lean one way and say, oh, it's horrible, you can't use it because it hasn't been precleared, but it's all right in drawing the interim plan to treat it as if preclearance has been denied. No, I don't know about that, because I think what a district court is supposed to do when preclearance is pending is not accept all the challenges. What it's supposed to do is to apply traditional districting criteria to the benchmark. So I guess I'd be— Kagan. So do you contest the view that this district court did essentially accept the challenges, did sort of say, well, look, there are these challenges, so we have to make sure that we don't do anything that cuts against them? Well, there is some language in the opinions to that effect, Justice Kennedy. I have to say the district court opinions here are not a model of clarity. In some respects, they seem to outline the right inquiry. If you look at Joint Appendix 137 to 138, I think what the district court said it was doing was starting with the status quo, which is the benchmark, and then modifying it. And if you look at Joint Appendix 146 to 147, it looks the exact opposite. It looks like they're drawing minority coalition opportunity districts to draw them because they have anticipated how they think the district court in D.C. is going to come out. Well, that's right, Mr. Chief Justice, and I think we point to that in our brief as an area in which the district court could give further explanation. Isn't it odd that this is a Section 2 suit, and yet Section 5 seems to be driving that, driving it? That's the problem with this litigation, it seems to me. Well, I think Section 5 can't help but drive it. And Section 5 applies only to some States and not others. Texas is at a tremendous disadvantage here in defending the Section 2 suit and in drawing different — and in having the judiciaries at a disadvantage in framing a remedy for a likely, a likely Section 2 violation in some of the districts. Well, of course, Your Honor, Texas is in a different position precisely because it's a covered jurisdiction. And when you have a Section 5 case, Section 5 can't help but take precedence in some respects precisely because a proposed change can't go into effect unless and until the covered jurisdiction shows that it's nondiscriminatory in purpose and effect. But I do think in the court's case — Well, I wonder if it should take precedence in a Section 2 suit. That's all this Court — this is the primary obligation of the Texas district court is to address Section 2 violations. That may be, Your Honor. But I think then if it can't address the Section 5 issue at all, then the one thing that shouldn't happen is that the Section 2 court gives effect to the unprecleared plan, because that's something the D.C. district court is supposed to do. Well, it's not giving effect to the uncleared plan. It's giving effect to a legislative judgment as to what is workable for all the factors and criteria that Justice Alito referred to, county lines, et cetera. We'll let you go on for a little longer. We may have a few more questions. Okay. Thank you, Mr. Chief Justice. I appreciate that. I guess what I would say, Justice Kennedy, is if you use the unprecleared plan as the starting point, which is what Texas proposes, you are giving effect to that, notwithstanding the preclearance requirement of Section 5. And with a covered jurisdiction, that's something that Section 5 doesn't allow. Now, I do think it's important to consider Texas's preclearance submission in the context of the other statewide preclearance submissions that have been submitted in this election cycle. If you look at the government's brief at pages 1A to 3A, I think what that bears out is that there's not a fundamental problem with Section 5 or the way Section 5 operates. The problem, insofar as it exists, is with respect to the particular submissions that Texas has made, because there were 20 submissions of statewide plans for administrative preclearance. In all 20 cases, the Attorney General precleared them. In 19 of the 20 cases, the Attorney General precleared it within the initial 60-day window. Counsel, I have your position. I understand you're straddling a position. That's why you're sitting in the back rather than the front row between the two parties. But it's a little unsatisfying, because what you say we should do when we're all back to the district court so it can give a greater explanation of what it's done. Isn't that going to be very wasteful? And it's kind of an odd order from this Court to send to a district court saying, you know, tell us more. Well, I don't know that it is, Your Honor, and I have two responses in that respect. First, and this goes to a question that Justice Alito asked earlier, what is this Court supposed to do in this situation? And I think one thing that could absolutely happen is if there were a remand, the D.C. district court could complete its preclearance proceeding, which would be very illuminating for what the Texas district court is supposed to do. And by way of guiding on that, what I would say is this. The D.C. district court has scheduled trial to begin on January 17th, it's supposed to last 8 days, closing arguments on February 3rd. If you look at what happened at the summary judgment stage, Justice Breyer, they had summary judgment arguments on one day. Breyer, I read the opinion and what she said on the phone and so forth. No, not that. It seems to me that it's a complicated case. Let's suppose you are completely right on your time schedule, then they will decide something. How could any human being redraw maps in 5 days or 10 days where you will have different – six different positions? I mean, I think it's impossible. How can you – I don't see how you could do it. Well, of course, if preclearance is granted, we won't have an issue with drawing maps. I think there is a – it seemed to me from reading it, I didn't think that the judge there is ready to grant preclearance. And the other thing in sending it back, I read the brief and then I read the opinions. I don't think I have – I'm not being too generous to the opinions, but I thought that they were saying throughout is we didn't try to draw extra coalition or extra opportunity districts. They emerged. They say emerged about seven times. They emerged as we tried to apply equal vote principles. And it's hardly surprising that it would, considering that the population growth is primarily due to the minority expansion. So it didn't seem to me – now, why do you want us to send it back to get more explanation when that seems to be the explanation and to me at first blush it seems like a perfectly good explanation? Maybe a brief answer. Sure. I think it's – if insofar as the coalition districts and ability districts emerge from natural growth, there's nothing suspect about them. The one example I'd point to is District 33. If you look at Joint Appendix pages 146 and 147, it's not clear what the – what the district court was doing in that regard. Thank you, counsel. Mr. Garza. Mr. Chief Judge, and may it please the Court. There seems to be general consensus on at least three points that we've talked about today. First, that the unprecleared plan cannot take effect. The second, that the district court is foreclosed from entering and engaging in an analysis of the issues that are pending before the three-judge court in Washington, D.C. And that at this point, a court-ordered plan must be implemented on an interim basis. Exclude me from the second. I'm not sure that I've gone along on that. As you phrased it, the way you phrased it, you say they cannot even make the kind of preliminary inquiry that your friend suggests. I think we're dealing with a matter of semantics, Your Honor, because the question is, did the Court give the State's plan deference? But it itself said that it began, as it should, as it has been directed by this Court, with the historical or benchmark configurations, and then respected the State's plan. And you know what I don't understand about your briefs, Mr. Garza, is if the State can't, if the plan has not been precleared, you should be saying the State can't look at the plan. But on the one hand, you're saying, well, isn't it great, because the Court did look at the plan, and on the one hand, and the other hand, you're saying the Court can't look at the plan. So which is it? Because there's a real tension. On one page, you say, isn't it great the Court looked at the Texas plan, and then you say the Court can't look at the Texas plan. We don't say that the Court can't look at the Texas plan. What we say is that the Court can't implement the Texas plan, and it certainly can't implement the Texas plan if there is any suspect of discrimination. And what it did, it was exactly the right measure. And you're saying the Court should look at the merits? I think that the Court did the appropriate thing by looking at the merits. Sotomayor Now, let's go to something Justice Scalia asked, was what does a court do with frivolous claims? Does it assume under your theory that those frivolous claims are valid? So and if you say no, it shouldn't assume that, then what level of inquiry should the Court engage in before it accepts or deviates from the enacted plan? I think that the Court should look at, first of all, should not start with the State's plan. It should look at where there have been objections made. And the role of the district court in the District of Columbia is where the question of whether there are frivolous claims have been made. And there have been no motions to dismiss any of the claims in Washington, D.C. based on frivolity. Sotomayor So the Texas court cannot, should automatically accept all, every district that a challenge has been raised in the D.C. circuit court or is okay? It should not accept any of the districts that have been challenged. But I think the difference in terms of is it assuming a violation? Roberts I don't mean to interrupt, but I didn't follow that. So long as a district has been challenged in D.C., the court in Texas should not accept it? It should make a determination either way, and it didn't, because in those districts it didn't adopt the plans that were put forward by the plaintiffs or the challengers in Washington, D.C. It looked at the benchmark plan, the starting point. Kennedy But could it look at that district and say, well, it respects county lines, it follows a river, it's got urban-rural? Or could it look at it for that reason? And rely on the legislative judgment as making a sound judgment that the river runs through here and the county line is there and so forth? That's, it seems to me, the difficulty with saying, oh, you can't look at the plan. Roberts I think the problem with that, Your Honor, is that then it would be assuming that the State is correct, that it doesn't violate section 5. That is a inquiry that's reserved to the district court in the District of Columbia. Roberts And that's right, but it goes the other way. When you say they can't approve something that's been challenged, aren't you assuming that the plaintiffs are right? And that's an inquiry that belongs to the district court in D.C.? Roberts No, because what the Court did is it didn't accept as a remedy what the plaintiffs proposed there. It reverted to State policy, which is what it's directed to do by this Court. It went back to State policy and it looked at the benchmark plan, and it started with the benchmark plan. Even with the congressional plan, where there are four new districts and there is no comparable district in the benchmark, it looked to the legislatively enacted plan to determine where it would place those districts. Scalia But that is not the current State policy. The benchmark plan is gone. It's old. The Texas legislature now has a different policy, and that, you say, should be ignored? Roberts That policy cannot be deferred to. It is incorporated in the Court's plan in the manner in which it did review the plans. That is, it looked at the benchmark plan to determine where it would place those districts. Scalia So there's a presumption of its invalidity. You can't presume it valid, but you can presume it invalid. Roberts Either way. And in fact, what the Court did is it did. Scalia No, not either way. You're presuming it invalid. Roberts You're not presuming it is invalid. You're suggesting that you're reverting to the next State policy. You're not incorporating it, but you're not making any decisions. And the way you sort of walk that tightrope is you go to what the State policy was before the enacted plan. Alito But let's say a legislature says we have a new policy, and that is that once we've satisfied our constitutional obligations and our obligations under the Voting Rights Act, the only thing we're going to do is try to draw the districts that are the most compact possible, compactness over everything else. They drop a plan that embodies that policy, and it's challenged under Section 5. Now, can the district court just say, well, that's the State's policy is compactness over everything else, but we don't agree with that because we have other neutral principles that advance the interest of the collective public good, which is the term that this — the words that this Court used. Can they do that? Roberts I don't believe they can, and this Court didn't. The Court, in fact, said that. They are constrained by State policy, except to the extent the Constitution or the Voting Rights Act requires otherwise. And in this case, part of the Voting Rights Act is Section 5. And in those areas and in those districts where there have been challenges — and by the way, the district court has — the District of Columbia has determined that those challenges are substantial, because they've denied a preclearance, and in fact, they've said that Texas has not disputed. Ginsburg They didn't deny a preclearance. Roberts I'm sorry? Ginsburg They denied summary judgment. Roberts They denied summary judgment, but they went even further. They said Texas has not disputed many of the intervener's specific allegations of discriminatory intent. So it's — and under the summary judgment standard, they have to find that the challenges that are being made are substantial. The district court in Texas was not free to incorporate discriminatory districts in its interim plan, and it didn't. But it first went to the State's plan, the benchmark plan, to begin its process on how it was drawing those districts. And there's a good reason why Texas is covered under the Voting Rights Act. As this Court indicated in Lulac v. Perry, there's a terrible history of historical discrimination in Texas, including discrimination in 2006. Roberts The constitutionality of the Voting Rights Act isn't at issue here, right? Ginsburg That's not. Roberts Okay. Maybe you could turn for a moment to the issue that I see on Joint Appendix 146 and 147. They don't say a minority coalition opportunity district just happened to emerge. It said that District 33 was drawn as a minority coalition opportunity district. And we've never held that it is appropriate or even permissible to draw a district where you're putting in together two minorities, two different minority groups. And it seems to me that that raises all sorts of different concerns. It's one thing under the Voting Rights Act to say that this group votes as a block and has been discriminated against in its ability to elect representatives of its choice. It's another thing to say that two different minority groups are put together because they share some particular view so that one candidate is going to be each of theirs candidates of choice. That goes quite a step further from what we've upheld under the Voting Rights Act. And here you have the district court creating that in the absence of any State expression of the desire to create that type of district. I think that the statement that the court made is a correct statement. It did create a coalition district in Dallas. But that's not describing how it reached that district. It describes how it reached that district as in a number of other places, however as discussed above, the court has not intentionally created any minority districts. New District 33 was drawn as a minority coalition opportunity district. I don't see how that can be read any way other than saying when we sat down and drew it, we drew this one as a minority coalition opportunity district. Of course it can be read differently than Your Honor's interpretation of this. Because the court has said over and over again, we did not attempt to create coalition districts. We did not attempt to draw a minority minority district. Scalia, I'm sorry. When you say something can be read differently than that and say because they said something else somewhere else, it's not responsive. What I'm suggesting is that what he's saying is that this is the result of what they've done. That sentence can also be interpreted as saying this is the result of what we've done. We have created a minority opportunity district. Drawn as? Drawn as a coalition? Yes. Yes. Breyer, it says in two sentences before, if I can be helpful to read it, the fourth new district, District 33, was drawn in the Dallas-Fort Worth Metroplex to reflect population growth in that area. All right? And then he goes on to say just what Justice Scalia says. Now, I did read that as saying, well, when you apply — I read it consistent what they said in Elsewhere, which is that what they're doing is population grows. You have to have one person, one vote. The legislature itself in the new plan did create a minority, whatever the opportunity district here. So we're following what they did. We're taking account population, and it turns out to be, and we do create it as, in which case there is some ambiguity here. Precisely. And there's no independent evidence that this was a racial gerrymander. What do courts look at for evidence of racial gerrymanders? Split voting precincts where you go out and carve and bring in minority voters. This district maintains voting precincts intact. It is entirely within one county. It is a compact district, especially when you compare it to the district in that part of the State. I'm sorry. Why do you care? Why do they care, then, that it was drawn as a minority coalition opportunity district? You're saying they didn't do that at all. They just followed precinct lines and everything else. Why would they say something? I believe it's describing what the result of their map drawing is, and I think that's perfectly legitimate. Kennedy, can we infer from either the ambiguity or the other reading of the sentence that the Chief Justice suggested, that in the Court's view it was desirable to have a minority coalition district? I draw that inference. I think it is desirable to have a minority district there. Minority coalition district? A minority coalition district. Moreover, I think the Court is talking about a minority coalition district. I'm not saying that this is a sound result. I believe that the plan that was drawn by the Court is fair. Is it the optimum plan that the plaintiffs wanted? It is not. One of the basic rules that was followed in drawing up the court plan was not to divide any voting districts, right? That's one of the principles. Why did they? That certainly is not a principle that the Texas legislature agrees with. There's two reasons, Your Honor. One is. So the Court just made it up? No. There are two reasons why the Court saw maintaining voting precincts as important. One is because that's what has been directed by this Court in Bush v. Veda. In Bush v. Veda, the Court said we have an interim election or an impending election, and it's important for elections administrators, in order to be able to implement without interference a legitimate election process, to have whole precincts. Because whole precincts makes a big difference in terms of how the election is administrated. The second reason is that this Court didn't adopt this plan without any inquiry into the standards and proposals from the parties. It was very deliberate, it was very cautious, and it was very open. We had three days of hearings on what these plans should look like and what the standards ought to be, including testimony from elections administrators and from the Texas Secretary of State. And in every instance, those administrators and that representative from the Secretary of State said the most important thing that the Court should consider, if it's going to order us to start conducting elections under a different plan, is maintain voting precincts, because that is the most cumbersome part. Alito, if Texas says we don't care about maintaining voting precincts, this is a matter of administrative burden and expense, and we're willing to bear that, so disregard that, the district court can say, well, we think we disagree with you, in order to make it more convenient to hold the election and less expensive for Texas, we're going to respect voting districts. They can do that? The State didn't do that in this instance. Could they do that? Could the district court do that? That's my question. It's — yes, I think they could, because there is still the authority of this Court in Bush v. Veta that directs courts in drawing interim plans for impending elections to be cautious about that, number one. And number two, if, in fact, in order to get an appropriate map, you must split a number of precincts, which means, then, that you can't conduct the election on April 3rd, we still have time. As the government's attorney indicated, the — there are States that conduct primaries as late as June 26th. The drop-dead deadline is not April 3rd, it's November 6th. So if this Court disagrees with our position and is determined to send this back to the district court, then it should consider this. The district court in the District of Columbia is about 30 days away from rendering a complete decision in the Section 5 case. That would place the Court in Texas in exactly the upham circumstance. In that circumstance — and the Court is poised to move. It can move with all due diligence. It had two weeks of trial in which it heard testimony on the plaintiff's claims. It's — it is — it is ready once the district court in the District of Columbia tells us these are the problems with the State's plan, the court in Texas is primed to make its decision on the plaintiff's claims under Section 2 and the Constitution. In that circumstance — Sotomayor, what's the real drop-dead date? It's not November 6th, because that's the date of the general election. What's the latest election — primary election that any State has, June 26th? June 26th, Your Honor. All right. So working backwards, what's the last — The last presidential primaries, isn't it? I don't want to interrupt, but isn't that the date of the last presidential primary rather than congressional? That's correct. So Utah is the last — is the State with the last primary in which it conducts both the State's primary and the presidential. There are, in fact, States that conduct primaries as late as September that have no presidential primary at all. Sotomayor, so how many days before that election do the — does the voting mechanism or apparatus need to set up the voting booths, et cetera? The critical date is 45 days from the election in order to ensure sending out a ballot to overseas voters, including the military. So if you go back 45 days, and then you give the jurisdiction sufficient time to develop a ballot, because you need a ballot to send to the — to the soldiers, then that's about what they've — what the testimony was, is that that takes about 90 days, I believe, is what they testified. So 45 days plus 90 days, and that's the drop-dead deadline. Go back from June 26th. Where does that leave us? If you go back from June 26th — Sotomayor, you could develop a plan by the end of March, and we could conduct an election in June, in late June. And when do you expect the D.C. court to finish? I would expect it to finish by — within 30 days of today, because we have closing arguments on the — on the 3rd of February, and if the court has act — will act with the sort of diligence that it did on summary judgment, which was a complicated record and a — and a large record, 6 days later it made its — its determination. It didn't issue its memorandum opinion, but it gave us something that we could run with. So that would be— And when do you expect our decision on the appeal from the district court in D.C.? Later this afternoon. They did write in a summary — in their summary judgment opinion, they made it sound like it's very complicated. Yes. And so that's why I'm — I have some doubts about how swiftly they're going to render their decision after what is the date the — the trial will end on February 3rd? That will be closing arguments, yes, Your Honor. Is there anything in the opinion from the three-judge court in the District of Columbia that indicates that there are some likely or potential violations that are Section 2 violations as well as Section 5 violations? From the — from the— And I can amend that to end in the submission of the parties. In the District of Columbia? Yes. Well, I believe that the — that the court has found that the plaintiffs have made substantial claims with regard to retrogression and intentional discrimination. And, of course, intentional discrimination— The second — the second being Section 2 violations as well. Intentional discrimination is a component of Section 2, yes, Your Honor. And it — and I think it's important to note that Judge Smith in Texas used, in a manner of speaking, the preliminary injunction standard that's being advocated by the State, and they would not be able to meet that standard, because generally, Judge Smith determined that the plaintiffs had presented colorable claims of statutory or constitutional infirmity, ruled that the plan was an extreme gerrymander, ruled that elimination of District 149 presented Section 5 problems, ruled that the legislature dismantled a minority district in Nueces County that presented Section 5 problems. Do you have substantive objections to the plan suggested by Judge Smith in the House and congressional districts? Yes, Your Honor. We believe that there are Section 5 claims with regard to Harris County. Judge Smith addressed the constitutional— Do you have some Section 2 objections? Well, that doesn't quite work. You have to talk about retrogression, I suppose. Right. And in District — in Harris County, the Court did equalize population per the failure of the State to justify the sorts of deviations that are contained in that district, but didn't provide, in our opinion, additional remedies. But Judge Smith's proposed plan for the Statehouse is, in fact, very similar to the majority. It differs by only one minority district. That is, one additional minority district is contained in the interim plan than is contained in Judge Smith's plan. Mr. Garza, what would you think of a system in which the Court could start with the Texas plan and say — the new Texas plan and say anything that's consistent with statutes and the Constitution can go forward? But it's Texas that has to show that consistency. So flipping the burden of proof in the way that Mr. Srinivasan was suggesting. In a way that makes it more consistent with Section 5's burden. Well, I think that our position is that Section 5 is clear, that this Court should not start with the interim plan. But if the Court disagrees with me, I think that that's a much more reasonable approach than the one offered by the State, for the same reason argued by the United States. That is, that in the State's argument, you really turn Section 5 on its head, because one of the principal benefits for the minority community in having Section 5 is that it alters the burden of proof. And if you maintain the burden of proof on the State before it can implement any portion of its newly adopted but unprecleared plan, that's far more preferable than shifting the burden, which would be inconsistent with Section 5 and its intent. I don't think I have anything else. Thank you. I don't think we do either. Thank you, counsel. Mr. Clement, you have three minutes remaining. Thank you, Mr. Chief Justice. Just a few points in rebuttal. As one of Justice Alito's questions highlighted, one of the things that makes remedying a one-person, one-vote problem particularly unique is there's literally an infinite number of ways to solve the problem. And for that reason, this Court has always looked wherever it could to legislative guidance, so much so that in White v. Weiser, this Court looked for legislative guidance to a plan that had been declared unconstitutional for failing to accommodate one-person, one-vote problems. But yet this Court still said that the district court erred in not taking that into account to the extent that it could. As to the hard choice, if it comes to that, of using either the legislative plan that reflects the legislative will or the judicial plan that even the United States concedes is flawed, I think this Court has faced even more difficult choices in the past. Bullock v. Weiser and in Whitcomb, and in both of those cases, this Court chose between an adjudicatedly unconstitutional State plan and a judicial remedy that it determined was flawed. And in both cases, it ordered the election to take place under the flawed, constitutionally adjudicated imperfect plan. Compared to that, simply saying that an election should go forward under a plan that hasn't been precleared is a far less serious step. Now, there was a reference made to the three days of hearings. But the problem is three days of hearings with an unadministrable standard is worse than one day of hearing with an unadministrable standard. And what we ask is for a preliminary injunction standard that's familiar to everybody, everybody understands, and everybody can apply. Scalia. Why shouldn't it be inverted, the way your friend suggests? Bullock. Well, I'll join everybody in saying that that's better than the worst alternative I face, which is to say it's better than the district court's opinion. But here's why it shouldn't. That actually further intrudes on the D.C. court. Because the question that the remedial court should not be asking is, geez, do I really think, you know, what are the odds that the D.C. court is going to preclear? It shouldn't ask that question at all. It should ask the questions that are before it. Is there a section 2 violation? Is there an equal protection violation? If there aren't those and I use the State's plan, does that create a section 5 violation? That's different from the preclearance question. And on that section 5 question, the burden is not logically on the State. And that's the same section 5 question that the Court considered on its own motion, because it understands that even when it takes a plan, it has to be consistent with section 5 principles. Now, Justice Kennedy, you've asked the question, what if we take section 5 out of this? What happens? Then it's an easy case. Then it's the preliminary injunction standard. Now, the objection to that, of course, is, well, but how can you take section 5 out of it? But there's not an interference with section 5 because Texas still understands it needs to get preclearance before its changes can take permanent effect. It absolutely, positively needs preclearance. It's never wavered from that recognition. So you go back to the other sentence. Okay. Well, I was simply going to say, if you go back, the default problem here is that there's an infinite number of solutions. It's particularly a problem with respect to the congressional map, where there's now four new seats. There's nothing else to defer to than the judgment of the legislature reflected in this plan, notwithstanding that it hasn't been precleared. Thank you. Roberts. Thank you, counsel, all counsel. I appreciate the extraordinary efforts you had over the holiday season. Thank you very much. The case is submitted.